# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| MOBILITY WORKX, LLC,<br>    *Plaintiff* | § <br> § <br> § | |
| v. | § <br> § | CIVIL ACTION NO. 4:24-CV-796<br>(Judge Mazzant) |
| ERICSSON, INC.,<br>    *Defendant* | § <br> § <br> § | |
| MOBILITY WORKX, LLC,<br>    *Plaintiff* | § <br> § <br> § | |
| v. | § <br> § | CIVIL ACTION NO. 4:24-CV-797<br>(Judge Mazzant) |
| NOKIA CORPORATION, NOKIA<br>SOLUTIONS AND NETWORKS OY, and<br>NOKIA OF AMERICA CORPORATION,<br>    *Defendants* | § <br> § <br> § <br> § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Mobility Workx, LLC's ("Plaintiff's" or "Mobility's") Opening Claim Construction Brief (Dkt. #26).[1]  Also before the Court is the Responsive Claim Construction Brief (Dkt. #27) filed by Defendants Ericsson Inc. ("Ericsson"), Nokia Corporation, Nokia Solutions and Networks Oy, and Nokia of America Corporation (collectively, "Nokia") (all, collectively, "Defendants")[2] as well as Plaintiff's reply (Dkt. #29).[3] Further before the Court are the parties' July 25, 2025 P.R. 4-3 Joint Claim Construction and

---

[1] Docket numbers refer to Civil Action No. 4:24-CV-796 unless otherwise indicated.  Plaintiff filed a substantively identical opening brief in Civil Action No. 4:24-CV-797, Dkt. 30.

[2] Nokia filed a substantively identical responsive brief in Civil Action No. 4:24-CV-797, Dkt. 31.

[3] Plaintiff filed a substantively identical reply brief in Civil Action No. 4:24-CV-797, Dkt. 33.

Prehearing Statement (Dkt. #24) and the parties' September 26, 2025 P.R. 4-5(d) Joint Claim Construction Chart Pursuant to P.R. 4-5(d) (Dkt. #30).

The Court held a claim construction hearing on October 8, 2025, to determine the proper construction of the disputed claim terms in United States Patents No. 7,697,508, 8,213,417, and 7,231,330 (collectively, the "patents-in-suit").

The Court issues this Claim Construction Memorandum Opinion and Order and hereby incorporates-by-reference the claim construction hearing and transcript.

## BACKGROUND

Plaintiff alleges infringement of United States Patents No. 7,697,508 ("the '508 Patent"), 8,213,417 ("the '417 Patent"), and 7,231,330 ("the '330 Patent") (collectively, "the patents-in-suit").

The '508 Patent, titled "System, Apparatus, and Methods for Proactive Allocation of Wireless Communication Resources," issued on April 13, 2010, and bears an earliest priority date of July 31, 2003. The Abstract of the '508 Patent states:

> A system for communication between a mobile node and a communications network is provided for use with a communications network having one or more communications network nodes that define a foreign agents [sic] and that communicate with the mobile node in a predefined region. The system includes a ghost-foreign agent that advertises a foreign agent so that the mobile node is aware of the foreign agent when the mobile node is located outside the predefined region. The system further includes a ghost-mobile node that signals the foreign agent in response to the foreign agent advertising and based upon a predicted future state of the mobile node.

The '417 Patent resulted from a continuation of the '508 Patent.

The '330 Patent, titled "Rapid Mobility Network Emulator Method and System," issued on June 12, 2007, and bears an earliest priority date of July 31, 2003. The Abstract of the '330 Patent states:

A system for emulating mobile network communications can include one or more wireless nodes configured to variably adjust signal reception sensitivity and signal transmission strength; at least one mobile node configured to wirelessly communicate with selected ones of the wireless nodes; and a network emulator communicatively linked to each wireless node. The network emulator can replicate attributes of a wired communications network. The system also can include a controller communicatively linked with the wireless nodes and configured to control signal reception sensitivity and signal transmission strength of each said wireless node, as well as a home agent configured to interact with at least one mobile node via selected ones of the wireless nodes.

The Court previously construed disputed terms in the '508 Patent and the '417 Patent in *Mobility Workx, LLC v. T-Mobile US, Inc., et al.*, No. 4:17-CV-567 (E.D. Tex. July 31, 2018) ("*T-Mobile*") and *Mobility Workx, LLC v. Cellco Partnership d/b/a Verizon Wireless, et al.*, No. 4:17-CV-872 (E.D. Tex. Mar. 15, 2019) ("*Verizon*"). The Southern District of Florida construed disputed terms in the '330 Patent in *University of Florida Research Foundation, Inc., et al. v. Motorola Mobility LLC*, No. 13-CV-61120-KMM (S.D. Fla. Feb. 19, 2014) ("*Motorola*").

Plaintiff accuses Ericsson of infringing all three of the patents-in-suit, and Plaintiff accuses Nokia of infringing the '508 Patent and the '417 Patent. (Dkt. #26 at p. 1 n.1). Defendants have jointly filed the same responsive claim construction brief in both of the above-captioned cases, so for simplicity and ease of reference the Court refers to all arguments therein as being the arguments of "Defendants."

## LEGAL STANDARDS

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The purpose of claim construction is to resolve the meanings and technical scope of claim terms. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). When the parties dispute the scope of a claim term, "it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1312–13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention.  *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive."  *Id.*  Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent."  *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance.  *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope.  *Phillips*, 415 F.3d at

1316.  Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001).  This presumption does not arise when the patentee acts as his own lexicographer.  *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.  For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'"  *Globetrotter Software, Inc. v. Elan Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics*, 90 F.3d at 1583).  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent.  *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").  The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum*

*Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g*, 334 F.3d at 1324. However, the prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002). Statements will constitute disclaimer of scope only if they are "clear and unmistakable statements of disavowal." *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003). An "ambiguous disavowal" will not suffice. *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) (citation omitted).

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig*

*Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).  "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120.  "Indefiniteness must be proven by clear and convincing evidence."  *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

"[P]rior orders in related cases do not bar the Court from conducting additional construction in order to refine earlier claim constructions."  *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J., sitting by designation).

In general, however, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*."  *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP Development, LLC v. Intuit Inc.*, No. 2:12-CV-180, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J.) ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839–40 (2015) ("prior cases will sometimes be binding because of issue preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

## ANALYSIS

### *Agreed Claim Terms*

In their July 25, 2025 P.R. 4-3 Joint Claim Construction and Prehearing Statement, the parties submitted the following agreed-upon constructions (Dkt. #24, Ex. A), which the Court hereby adopts as agreed-upon:

| U.S. Patents No. 7,967,508 and 8,213,417 | |
| --- | --- |
| <u>Term</u> | <u>Agreed Construction</u> |
| "mobile node"<br>('508 Patent, Claims 7–12, 14–19; '417 Patent, Claims 1, 3) | Plain and Ordinary Meaning |
| "a foreign agent identified for each of the geographical future states" / "identifying at least one foreign agent for each of said geographical future states"<br>('508 Patent, Claims 7, 14) | Plain and Ordinary Meaning |
| "when the mobile node is located in a geographical area where the foreign agent is not physically present"<br>('417 Patent, Claim 1) | "when the mobile node is located outside of the region covered by the foreign agent" |
| "a ghost-mobile node that creates replica IP messages on behalf of a mobile node"<br>('417 Patent, Claim 1) | "a ghost-mobile node that copies IP messages on behalf of a mobile node" |
| "the ghost-mobile node triggering signals based on a predicted physical location of such mobile node or distance with relation to the at least one foreign agent"<br>('417 Patent, Claim 1) | Plain and Ordinary Meaning |
| U.S. Patent No. 7,231,330 | |
| <u>Term</u> | <u>Agreed Construction</u> |
| "fixedly-located"<br>('330 Patent, Claims 1, 11) | "set at a particular location" |

| "configured to variably adjust wireless communication characteristics"<br><br>('330 Patent, Claim 1) | "configured such that the controller can cause the wireless network nodes to adjust wireless communication characteristics of the wireless network nodes" |
|---|---|
| "communicatively linked"<br><br>('330 Patent, Claims 1, 2, 5, 16) | "capable of transmitting and receiving signals via an interface" |
| "without changing operating parameters of said at least one mobile node" / "without changing operating parameters of the mobile node"<br><br>('330 Patent, Claims 1, 11) | Plain and Ordinary Meaning |

*Disputed Claim Terms in United States Patents No. 7,697,508 and 8,213,417*

In the discussion herein, the disputed terms in United States Patents No. 7,697,508 and 8,213,417 are numbered here as they appear in the parties' July 25, 2025 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. #24, App'x B).

**1. "ghost mobile node" and "ghost-mobile node"**

| **"ghost mobile node"**<br>**"ghost-mobile node"**<br>('508 Patent, Claims 7, 8, 11–15; '417 Patent, Claims 1, 3, 6) ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a node, or a virtual node, that can operate on behalf of the mobile node" | "a node, or a virtual node, that can operate on behalf of the mobile node and that is capable of registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the physical area covered by the foreign agent" |

(Dkt. #24, App'x B at p. 1; Dkt. #30 at p. 1 of 54).

### a.  The Parties' Positions

Plaintiff submits that the Court previously adopted Defendants' construction, and Plaintiff "does not wish to rehash the arguments made previously, but rather merely wishes to note its objection to preserve the right to seek review."  (Dkt. #26 at p. 3).

Defendants respond that "[t]he Court already analyzed this claim term in detail in the *T-Mobile* Case," and "[b]ased on the intrinsic record and this Court's prior reasoning, the Court should adopt the construction provided in the *T-Mobile* Case."  (Dkt. #27 at p. 9).

Plaintiff replies, in full: "Mobility objected to the construction adopted by the Court in *T-Mobile*, and after losing that battle chose not to rehash the arguments in *Verizon* merely for the sake of comity with that defendant.  Mobility never argued for the construction adopted by the Court, and its willingness to concede to the *T-Mobile* construction in *Verizon* was not Mobility taking a position then that is 'plainly inconsistent' with its position in this case.  Mobility merely wishes to advance what it believes is the right construction and preserve its right for review." (Dkt. #29 at p. 2).

### b.  Analysis

The Court analyzed and construed this disputed term in *T-Mobile* (*see T-Mobile* at 7–14), and Plaintiff does not justify departing from the Court's analysis in *T-Mobile*.

Further, in *Verizon*, the Court adopted this construction as agreed-upon.  *Verizon* at 6. Plaintiff's proposal to remove the requirement that a ghost mobile node "is capable of registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the physical area covered by the foreign agent" is inconsistent with Plaintiff's affirmatively agreed-upon construction in *Verizon*, which the Court accepted.  *Id.*  Plaintiff is therefore judicially estopped from proposing a different construction.  *See, e.g., Love v. Tyson Foods, Inc.,*

677 F.3d 258, 261 (5th Cir. 2012) ("In determining whether to apply judicial estoppel, we primarily look for the presence of the following criteria: (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently.") (citations and internal quotation marks omitted).   This estoppel precludes Plaintiff's attempt to "note its objection to preserve the right to seek review."  (Dkt. #26 at p. 3).

Alternatively, even if Plaintiff were not estopped, the Court relies on the analysis set forth for this same disputed term in *T-Mobile*.  *See T-Mobile* at 7–14.

The Court therefore hereby construes **"a ghost mobile node"** to mean **"a node, or a virtual node, that can operate on behalf of the mobile node and that is capable of registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the physical area covered by the foreign agent."**

## 2. "foreign agent"

| "foreign agent" ('508 Patent, Claims 7, 8, 14, 18, 19; '417 Patent, Claims 1, 3, 6) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a network node on a visited network that assists the mobile node in transmitting or receiving communications" | "a network node on a visited network that assists the mobile node in receiving communications" |

(Dkt. #24, App'x B at p. 1; Dkt. #30 at p. 6 of 54).

### a. The Parties' Positions

Plaintiff submits that it "agrees with almost all of the Court's prior construction but proposes one slight change, that a 'foreign agent' is a network node that assists the mobile node

in 'transmitting or receiving' communications not just 'receiving communications.'"  (Dkt. #26 at p. 3).

Defendants respond that "the Court analyzed this claim term in detail in the *T-Mobile* and *Verizon* Cases and should adopt its prior construction," and Defendants argue that Plaintiff's proposal of adding the word "transmitting" is not supported by the intrinsic record.  (Dkt. #27 at p. 10).

Plaintiff replies, in full: "As noted by Defendants in their Response Brief, the two times the Court previously addressed this term, Mobility advocated for construction that the Court did not adopt.  Mobility here merely seeks to preserve its right to respectfully seek review of the Court's construction."  (Dkt. #29 at p. 2).

### b.  Analysis

Claim 7 of the '508 Patent, for example, recites:

> 7. A wireless node pair comprising:
> a mobile node for communicating with a wireless communications network, wherein the mobile node has a corresponding geographical current state and one or more predicted geographical future states; and
> a ghost mobile node associated with the mobile node, wherein the ghost mobile node can announce to a *foreign agent* identified for each of the geographical future states, the presence of said ghost mobile node for signaling the *foreign agent* based upon each of one of the predicted future states of the mobile node, wherein the ghost mobile node is configured to predict the future state based upon Global Positioning System (GPS) data obtained from a GPS unit communicatively linked to the mobile node, wherein the ghost-mobile node is remote from the mobile node, wherein each of the predicted future states comprises a geographic region that includes the *foreign agent*, and wherein the mobile node establishes another ghost mobile node in the geographic region based at least in part on the GPS data.

The specification discloses:

> The home agent 205 can initiate a tunnel to the foreign agent 210 and transmit a registration reply. The foreign agent 210 can create a tunnel to the foreign agent 215, defining a leaf foreign agent, and forward the registration reply to the foreign

agent. The foreign agent 215 then can transmit the registration reply to the mobile node 250.

'508 Patent at 10:44–49 (emphasis added).

In *T-Mobile*, the defendants in that case proposed construing "foreign agent" to mean "a network node on a visited network that assists the mobile node in receiving communications delivered to a care-of address," and the Court found:

> No definition or disclaimer is apparent that would require a foreign agent to necessarily use a "care-of address." Instead, this is a specific feature of particular embodiments that should not be imported into the claims. *See Phillips*, 415 F.3d at 1323.
>
> Nonetheless, Defendants properly criticize Plaintiff's proposed construction as encompassing home agents as well as foreign agents. Plaintiff's expert has acknowledged that Plaintiff's proposed construction might encompass any type of router. (*See* Dkt. #35, Exhibit J, May 18, 2018 Blackburn dep. at 52:16–53:10). The patents-in-suit, by contrast, distinguish between home agents and foreign agents. *See, e.g.,* '508 Patent at Cls. 6 & 8 (reciting a "home agent"); '417 Patent at Cl. 1 (reciting "at least one home agent" and "at least one foreign agent"); *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("[w]here a claim lists elements separately, the clear implication of the claim language is that those elements are distinct component[s] of the patented invention") (citations and internal quotation marks omitted). The above-reproduced disclosure, for example, likewise reinforces that there is a distinction between home agents and foreign agents. *See* '508 Patent at 1:35–59. Additional disclosure cited by Plaintiff, as to foreign agents being implemented by software or by special-purpose hardware, does not compel otherwise. *See id.* at 4:45–49.
>
> The Court therefore hereby construes "foreign agent" to mean "a network node on a visited network that assists the mobile node in receiving communications."

*T-Mobile* at 17 (emphasis omitted); *see id.* at 14–17; *see also Verizon* at 13 (rejecting Plaintiff's proposal to modify *T-Mobile* construction as to the "visited network").

Plaintiff does not persuasively justify departing from the *T-Mobile* construction. The above-reproduced disclosures, which are cited by Plaintiff, refer to a foreign agent transmitting a registration reply to a mobile node, but Plaintiff does not demonstrate that this amounts to disclosure of a foreign agent assisting a mobile node in transmitting.

The Court therefore hereby construes "foreign agent" to mean **"a network node on a visited network that assists the mobile node in receiving communications."**

### 3. "ghost foreign agent" and "ghost-foreign agent"

| "ghost foreign agent" "ghost-foreign agent" ('508 Patent, Claim 14; '417 Patent, Claims 1, 6) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a node, or a virtual node, corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network proximate to the predicted future location of the mobile node" | "a virtual node corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network proximate to the predicted future location of the mobile node" |

(Dkt. #24, App'x B at p. 2; Dkt. #26 at p. 4 & n.2; *see* Dkt. #30 at pp. 10–11 of 54).

### a. The Parties' Positions

Plaintiff submits: "[A] 'ghost-foreign agent' does not have to be virtual, as defendants propose. Rather, as Mobility proposes, a 'ghost-foreign agent' can be 'a node, or a virtual node.' This also aligns with the construction of 'a ghost mobile node' that is 'a node, or a virtual node.' This issue was not raised or addressed by the Court previously." (Dkt. #26 at p. 4).

Defendants respond that "the Court analyzed this term in detail in the *T-Mobile* Case," and "[b]ased on the intrinsic record and this Court's prior reasoning, the Court should adopt the construction provided in the *T-Mobile* Case." (Dkt. #27 at p. 11.) Defendants also argue that "[c]onsistent with the Court's construction in the *T-Mobile* Case, the patent specification teaches away from Mobility's proposal of an alternative, non-virtual 'node.'" (*Id.* at 12).

Plaintiff replies that "Mobility merely proposes one slight change to the term, not a plainly inconsistent construction of the term with which it previously consented for the sake of

comity in *Verizon*." (Dkt. #29 at p. 3). Plaintiff also argues that "[t]he plain language of the specification cited by Defendants itself defines a ghost foreign agent as 'instances or virtual.' This expressly adopts Mobility's position that this term can be a 'node or a virtual node.'" *Id.*

### b. Analysis

The Court analyzed and construed this disputed term in *T-Mobile* (*see T-Mobile* at 17–20 (citing, e.g., '508 Patent at 2:44–48, 3:1–10, 3:66–4:18, 4:45–49, 10:17–32 & 11:1–31)), and Plaintiff does not persuasively justify departing from the Court's analysis in *T-Mobile*. Also, whereas Plaintiff here argues this term should not be limited to a "virtual" node, in *T-Mobile* Plaintiff proposed construing this term as "a virtual computer . . . ." *See T-Mobile* at 17. The defendant in *T-Mobile* proposed "a virtual node . . ." (*id.*), so the "virtual" aspect was agreed-upon in *T-Mobile*, and the Court adopted it. Further, in *Verizon*, the parties there presented the *T-Mobile* construction as being agreed-upon, and the Court adopted this agreed-upon construction. *Verizon* at 6.

In some cases, a consideration regarding estoppel "is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Altair Eng'g, Inc. v. LEDdynamics, Inc.*, 413 F. App'x 251, 256 (Fed. Cir. 2011).

Nonetheless, because the doctrine of judicial estoppel primarily protects the judicial process rather than any particular litigant, the estoppel issue turns not on any purported detriment to the opposing party but rather on the Court's reliance on Plaintiff's assertions. *Love*, 677 F.3d at 261 ("detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary") (citations and internal quotation marks omitted).

Here, the Court relied on Plaintiff's assertions in *T-Mobile* and *Verizon*, and Plaintiff is therefore judicially estopped from now proposing a different construction. *Id.*

The Court accordingly hereby construes **"the ghost-foreign agent"** to mean **"a virtual node corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network proximate to the predicted future location of the mobile node."**

### 4. "geographical current state"

| "geographical current state" ('508 Patent, Claims 7, 14) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "coverage area of an agent through which the mobile node is linked to the network at its current location" |

(Dkt. #24, App'x B at p. 2; Dkt. #30 at p. 14 of 54).

### a. The Parties' Positions

Plaintiff submits that whereas this construction was agreed-upon in *T-Mobile*, Defendants' proposal to limit this term to "coverage area" "unjustifiably narrows the claim term by excluding other possible geographical status information." (Dkt. #26 at pp. 4–5).

Defendants respond that Plaintiff has shifted positions and now departs from the construction it previously stipulated to and that the Court adopted. (Dkt. #27 at p. 13). Defendants argue that "[a]lthough Mobility's new claim construction is 'plain and ordinary meaning,' it manipulates the phrase 'coverage area' to exclude certain geographical status information that was included in the Court's prior construction." (*Id.*) (citation omitted).

Defendants also cite disclosures in the specification. (*Id.* at p. 14) (citing '508 Patent at 4:3–14 & 6:39–43).

Plaintiff replies that "Mobility merely agreed to a certain construction without any argument being made by either party at all," and "[t]hus, Mobility is not now taking a position on this term that [is] plainly inconsistent with a prior position." (Dkt. #29 at p. 3). Plaintiff also argues that Defendants' own expert has opined that "geographical current state" encompasses more than just coverage area. (*Id.* at p. 4) (citing Dkt. #27, Ex. K, Sept. 8, 2025 Proctor Decl. ¶ 65).

### b. Analysis

In *T-Mobile*, the Court relied on "agreement between the parties" and quoted Plaintiff's statement in its reply claim construction brief as follows:

> Upon further consideration of Defendants' proposed construction, and in an effort to reduce the issues before the Court, Mobility is willing to agree to Defendants' proposed construction of this term, without agreeing with Defendants' argument/evidence in support thereof. Mobility expressly reserves the right to provide argument/evidence supporting this proposed construction, as necessary. Accordingly, Mobility withdraws its construction and accepts Defendants' construction for this term.

*T-Mobile* at 21 (citing No. 4:17-CV-567, Dkt. #36 at p. 6). The Court also noted that this agreement was set forth in the parties' subsequent Joint Claim Construction Chart in that case. *T-Mobile* at 21 (citing No. 4:17-CV-567, Dkt. #38, Ex. A at p. 1).

Plaintiff's claim construction argument in the present case is contrary to the construction that Plaintiff affirmatively accepted in *T-Mobile*. Because the doctrine of judicial estoppel primarily protects the judicial process rather than any particular litigant, the estoppel issue turns not on any purported detriment to the opposing party but rather on the Court's reliance on Plaintiff's assertion. *Love*, 677 F.3d at 261 ("detrimental reliance by the opponent of the party

against whom the doctrine is applied is not necessary") (citations and internal quotation marks omitted).   The Court relied on Plaintiff's assertions as to the construction of this term, and Plaintiff's current interpretation—which attempts to encompass "other possible geographical status information," "such as an eNB ID, Tracking Area ID, Cell ID, or latitude and longitude of an eNB antenna" (Dkt. #26, at p. 4) (citation omitted)—is inconsistent with the construction agreed upon in *T-Mobile*.   Plaintiff is therefore judicially estopped from opposing Defendants' proposed construction (the *T-Mobile* construction) in the present case.   *Love*, 677 F.3d at 261.

The Court accordingly hereby construes **"geographical current state"** to mean **"coverage area of an agent through which the mobile node is linked to the network at its current location."**

### 5.   "[predicted] geographical future state(s)"

| "[predicted] geographical future state(s)" ('508 Patent, Claims 7, 14) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "coverage area, within a wireless communications network, in which the mobile node is predicted to be able to be linked to the wireless communication network at a time in the future" |

(Dkt. #24, App'x B at p. 2; Dkt. #30 at p. 16 of 54).

### a.   The Parties' Positions

Plaintiff presents substantially the same argument for this term as for "geographical current state" (addressed above).   (Dkt. #26 at pp. 5–6; Dkt. #29 at p. 4).

Defendants respond that "Mobility does not offer any arguments for this term distinct from its arguments for 'geographical current state.'"   (Dkt. #27 at p. 15.)

### b. Analysis

Because the parties present no distinct arguments as to this term apart from the discussion of the constituent term "geographical current state," which is addressed above, the Court hereby adopts the same construction that the Court reached in *T-Mobile*. *See T-Mobile* at 22–25.

The Court therefore hereby construes "[predicted] geographical future state" to mean **"coverage area, within a wireless communications network, in which the mobile node is predicted to be able to be linked to the wireless communications network at a time in the future."**

### 6. "the mobile node establishes another ghost mobile node in the geographic region based at least in part on the GPS data"

| "the mobile node establishes another ghost mobile node in the geographic region based at least in part on the GPS data" ('508 Patent, Claim 7) ||
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 3; Dkt. #30 at p. 18 of 54).

### a. The Parties' Positions

Plaintiff argues that "Defendants cannot prove with clear and convincing evidence that this phrase fails to inform one of skill in the art of the scope of the invention," and "[t]he specification describes, for example, the claimed invention's use of GPS information as well as triangulation of wireless signals." (Dkt. #26 at p. 6) (citing '508 Patent at 6:47–67).

Defendants respond that "[t]he phrase is not indefinite because of the recitation of 'GPS data,' it is indefinite because the 'establishment' of a ghost node has no regularly understood meaning, let alone the establishment of 'another ghost mobile node,' as recited by the claim. A

person of ordinary skill is thus left to guess—without any guidance from the '508 Patent itself—as to what this phrase means, rendering it is [*sic*] invalid as indefinite."  (Dkt. #27 at p. 15).

Plaintiff replies that "the term 'establish' is used repeatedly in the specification of the '508 patent," and "[t]he meaning of the term 'establish' from the specification is thus to 'create' or 'set up', which is the plain and ordinary meaning of the term, and the meaning of the term in the phrase 'establishes another ghost mobile node.'"  (Dkt. #29 at p. 5) (citing '508 Patent at 1:30–34, 1:52–55 & 2:24–30).

### b. Analysis

Claim 7 of the '508 Patent, for example, recites:

7. A wireless node pair comprising:
a mobile node for communicating with a wireless communications network, wherein the mobile node has a corresponding geographical current state and one or more predicted geographical future states; and
a ghost mobile node associated with the mobile node, wherein the ghost mobile node can announce to a *foreign agent* identified for each of the geographical future states, the presence of said ghost mobile node for signaling the *foreign agent* based upon each of one of the predicted future states of the mobile node, wherein the ghost mobile node is configured to predict the future state based upon Global Positioning System (GPS) data obtained from a GPS unit communicatively linked to the mobile node, wherein the ghost-mobile node is remote from the mobile node, wherein each of the predicted future states comprises a geographic region that includes the *foreign agent*, and wherein *the mobile node establishes another ghost mobile node in the geographic region based at least in part on the GPS data.*

The specification discloses, for example, using "a Global Positioning System (GPS unit":

According to one embodiment of the present invention, the mobile node pair 202 can further include a Global Positioning System (GPS) unit to facilitate the above-described predictions of the future state of the mobile node 250. Using the GPS unit, location information on the mobile node 250 can be obtained and subsequently used, for example, to estimate which of multiple foreign agents are closest and when the mobile node is likely to arrive in the region served by the closest foreign agent. The ghost-mobile node 220 can perform the function of determining the closest foreign agent.

> It be will readily appreciated, that other systems for determining location information can be used and that the present invention is not limited to embodiments using GPS units. Any of various mobile communication techniques employed for mobile telephony can similarly be used, for example. Alternately, for example, the foreign agents 215, 230 can be configured to triangulate the position of the mobile node 250 using signal strength or through the use of wireless sensors. Thus, the mobile node 250 can be configured to notify the foreign agents 215, 230 of its position from time to time or at regular intervals. Alternatively, the foreign agents 215, 230 can be configured to determine the location of the mobile node 250 from time to time or at regular intervals as the case may be.

'508 Patent at 6:47–7:5; *see id.* at 11:19–24 (regarding "virtual instantiation of the ghost-mobile node").

Defendants argue that "because the mobile node is not present in 'the geographic region' of the 'predicted future state' of the mobile node, the mobile node cannot 'establish' anything" (Dkt. #27 at p. 16) (citation omitted), but if anything this is a potential argument regarding enablement, not claim construction. *See Phillips*, 415 F.3d at 1327 ("we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction"). The meaning and scope of the term here at issue is reasonably clear, and the opinions of Defendants' expert to the contrary are unpersuasive. (*See id.*, Ex. K, Sept. 8, 2025 Proctor Decl. ¶¶ 70–72). Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "the mobile node establishes another ghost mobile node in the geographic region based at least in part on the GPS data" to have its **plain meaning**.

### 7. "while the mobile node remains in the geographical current state"

| "while the mobile node remains in the geographical current state" ('508 Patent, Claim 14) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "before the mobile node physically arrives in the geographical future state" |

(Dkt. #24, App'x B at p. 3).

As noted in Defendants' responsive claim construction brief, Defendants now "agree that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 8 n.5; *see* Dkt. #30 at p. 19 of 54).

The Court therefore hereby construes "while the mobile node remains in the geographical current state" to have its **plain meaning**.

### 8. "the data comprising at least one of an P source and an P destination"

| "the data comprising at least one of an P source and an P destination" ('508 Patent, Claims 8, 15) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 3).

As noted in Defendants' responsive claim construction brief, Defendants now "agree that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 8 n.5; *see* Dkt. #30 at pp. 20–21 of 54).

The Court therefore hereby construes "the data comprising at least one of an P source and an P destination" to have its **plain meaning**.

### 9. "correspondent node"

| "correspondent node" ('508 Patent, Claims 11, 17) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a node, other than the home agent, in a home network capable of receiving communications from other network nodes" |

(Dkt. #24, App'x B at p. 3).

As noted in Defendants' responsive claim construction brief, Defendants now "agree that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 8 n.5; *see* Dkt. #30 at p. 21 of 54).

The Court therefore hereby construes "correspondent node" to have its **plain meaning.**

### 10. "the at least one network communications node"

| "the at least one network communications node" ('508 Patent, Claim 13) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 3; Dkt. #30 at p. 22 of 54).

### a. The Parties' Positions

Plaintiff argues that "Defendants cannot prove with clear and convincing evidence that this phrase fails to inform one of skill in the art of the scope of the invention," and "[o]ne of skill would recognize that the 'at least one network communications node' in dependent claim 13 refers to the 'mobile node for communicating with a wireless communications network' claimed in claim 7 from which claim 13 depends." (Dkt. #26 at p. 8) (citation omitted).

Defendants respond that this term lacks any reasonably clear antecedent basis because "there is no 'at least one network communication node' recited in claim 7, from which claim 13 depends, that could possibly provide any antecedent support for the phrase in claim 13." (Dkt. #27 at pp. 16–17). Defendants argue the intrinsic record does not resolve the ambiguity or tie this phrase to a specific antecedent. (*Id.* at p. 17).

Plaintiff replies that "[t]here is simply no basis to limit 'network communications node' to exclude 'mobile nodes' such that this claim term is indefinite for lack of antecedent basis." (Dkt. #29 at p. 5).

### b. Analysis

Claim 13 of the '508 Patent depends from Claim 7, and Claims 7 and 13 recite:

7. A wireless node pair comprising:
    *a mobile node for communicating with a wireless communications network*, wherein the mobile node has a corresponding geographical current state and one or more predicted geographical future states; and
    a ghost mobile node associated with the mobile node, wherein the ghost mobile node can announce to a foreign agent identified for each of the geographical future states, the presence of said ghost mobile node for signaling the foreign agent based upon each of one of the predicted future states of the mobile node, wherein the ghost mobile node is configured to predict the future state based upon Global Positioning System (GPS) data obtained from a GPS unit communicatively linked to the mobile node, wherein the ghost-mobile node is remote from the mobile node, wherein each of the predicted future states comprises a geographic region that includes the foreign agent, and wherein the mobile node establishes another ghost mobile node in the geographic region based at least in part on the GPS data.

\* \* \*

13. The wireless node pair as defined in claim 7, wherein *the at least one network communications node* comprises a plurality of network communication nodes, and wherein ghost-mobile node determines a closest communications network node from among the plurality of communications network nodes.

No explicit antecedent basis is apparent because Claim 7 contains no recital of a "network communications node."

Plaintiff nonetheless argues that "the at least one network communications node" in Claim 13 refers back to the recital of "a mobile node for communicating with a wireless communications network" in Claim 7. (Dkt. #26 at p. 8). Plaintiff's named-inventor-expert opinion regarding this term is as follows: "At the time of the invention, one of ordinary skill in the art would have understood the phrase 'the at least one network communications node' in '508 claim 13 to be referring to the 'mobile node' in claim 7 from which claim 13 depends because claim 7 describes the 'mobile node' as being 'for communicating with a wireless communications network.'" (*See id.*, Ex. 4, Aug. 18, 2025 Helal Decl. ¶ 17).

Antecedent basis sometimes can be implicit rather than explicit. *See Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (holding that "an anode gel comprised of zinc as the active anode component" provided implicit antecedent basis for "said zinc anode"); *see also Ex Parte Porter*, 25 U.S.P.Q. 2d (BNA) 1144, 1145 (B.P.A.I. 1992) ("The term 'the controlled fluid' . . . finds reasonable antecedent basis in the previously recited 'controlled stream of fluid . . . .'"); *Fisher-Price, Inc. v. Graco Children's Prods.*, No. 05-1258, 154 F. App'x 903, 909 (Fed. Cir. Nov. 4, 2005) ("[a] claim is not invalid for indefiniteness if its antecedent basis is present by implication") (citations omitted).

Here, however, Plaintiff's proposal to construe the "communications node" at issue in Claim 13 as referring back to "a mobile node" in Claim 7 is too great of a leap and cannot be fairly analogized to the above-cited authorities regarding implicit antecedent basis. The above-reproduced opinion of Plaintiff's named-inventor-expert does not compel otherwise. Alternatively and in addition, Defendants argued at the October 8, 2025 hearing that a species (in Plaintiff's view, a "mobile node") cannot provide antecedent basis for a genus (in Plaintiff's view, a "network communications node"), and Plaintiff did not persuasively show otherwise.

The lack of antecedent basis renders the claim indefinite. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable") (citing *Energizer*, 435 F.3d at 1370–71).

The Court thus finds that the term "the at least one network communications node" lacks antecedent basis and that Claim 13 of the '508 Patent is therefore **indefinite**.

### 11. "The method as defined in claim 17, further comprising a pair of network communication nodes"

| "The method as defined in claim 17, further comprising a pair of network communication nodes" ('508 Patent, Claim 18) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 4; Dkt. #30 at p. 22 of 54).

#### a. The Parties' Positions

Plaintiff argues that "Defendants cannot prove with clear and convincing evidence that this phrase fails to inform one of skill in the art of the scope of the invention," and "[o]ne of skill would recognize that the method claimed in claim 18[, which] depends from claim 17 which itself depends from claim 14[,] may comprise a 'pair of network communication nodes' because wireless communications networks, as described in the specification of the '508 patent, may have a plurality of network nodes as claimed." (Dkt. #26 at pp. 8–9) (citation omitted).

Defendants respond that this limitation is indefinite because "pair of network communication nodes" has no clear antecedent within the claim language, and Defendants argue that "the glaring problem with the claim's generic recitation of 'a pair of network communication

nodes' is that the phrase is conceivably broad enough to suggest at least any one of the definitions for 'the at least one network communication node' term recited above."  (Dkt. #27 at p. 18) (citation omitted).

Plaintiff replies that "[t]he term 'node' was purposefully used in the '508 patent to broadly encompass all types of nodes that can exist on a wireless communications network, be they mobile nodes, ghost-mobile nodes, foreign agents, etc."  (Dkt. #29 at p. 6).

### b.  Analysis

Claim 18 of the '508 Patent depends from Claim 17, which in turn depends from Claim 14.  Claims 14, 17, and 18 recite (emphasis added):

14. A computer-implemented method for handling mobile devices in a wire [*sic*] communications network, the method comprising the computer-executable steps of:
> identifying a mobile node communicatively linked to the wireless communications network;
> determining a geographical current state of the mobile node;
> predicting one or more geographical future states of the mobile node, based upon Global Positioning System (GPS) data obtained from a GPS unit communicatively linked to the mobile node;
> identifying at least one foreign agent for each of said geographical future states;
> creating at least one ghost foreign agent for each of said foreign agents, wherein said ghost foreign agent can announce to said mobile node or said ghost mobile node associated with the mobile node, the presence of said ghost foreign agent;
> while the mobile node remains in the geographical current state, registering said ghost mobile node or mobile node with the associated ghost foreign agent or foreign agent; and
> linking the mobile node with a foreign agent associated with at least one of said ghost foreign agents when the mobile node enters a respective geographical future state associated with said foreign agent.

* * *

17. The method as defined in claim 14, further comprising the step of buffering communications communicated to the mobile node from a correspondent node of the communications network.

18. *The method as defined in claim 17, further comprising a pair of network communication nodes* defining a first and a second foreign agent, and estimating which foreign agent is closest to the mobile node.

Defendants do not establish any antecedent basis requirement for this recital of "a pair of network communication nodes," and the specification refers to "pairs" of nodes. *See, e.g.,* '508 Patent at Figs. 2A & 2B. The indefiniteness opinions of Defendants' expert regarding this term are unpersuasive. (*See* Dkt. #27, Ex. K, Sept. 8, 2025 Proctor Decl. ¶¶ 75–78). Also, at the October 8, 2025 hearing, Defendant argued that the claim lacks sufficient clarity as to what types of "network communication nodes" are being referred to, but Plaintiff persuasively responded that the breadth of this term does not give rise to indefiniteness. *See, e.g., BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017) ("breadth is not indefiniteness") (citation omitted). The Court therefore hereby expressly rejects Defendants' indefiniteness argument as to this term in Claim 18. Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "[t]he method as defined in claim 17, further comprising a pair of network communication nodes" to have its **plain meaning**.

### 12. "tunnel"

| "tunnel" ('417 Patent, Claim 3) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a data path for transmitting data intended for use only within a private network through a public network such that the public routing nodes are unaware that the transmission is part of a private network" |

(Dkt. #24, App'x B at p. 4; Dkt. #30 at p. 23 of 54).

### a. The Parties' Positions

Plaintiff argues the patent uses "tunnel" in its ordinary networking sense and that the specification discusses tunnels generally and does not limit the term "tunnel" to being private-over-public. (Dkt. #26 at p. 10).

Defendants respond that the specification explicitly defines "tunneling" as transmission of data "intended for use only within a private . . . network through a public network" such that the routing nodes in the public network are unaware that the transmission is part of a private network. (Dkt. #27 at p. 19).

Plaintiff replies:

Defendants argue that "there is no question that 'tunneling' is accomplished with 'tunnels,'" Response Brief at 19, but even if that is true, it does not justify limiting the term "tunnel" to only performing the function of "tunneling" given the specification adopts the plain and ordinary meaning of the term "tunnel" of "a point-to-point connection established between two endpoints over a public or private network (trusted or untrusted), such as the Internet," Decl. Helal at 5-6, or "a communication pathway between two devices or networks over an existing communication network enabling the transfer of data as if they were directly connected." Decl. Hernandez at 9-10. Defendants' position on this term is a transparent attempt to limit the claim to private network data tunnels to set up a non-infringement argument but the entirety of the patent is directed to public wireless networks on which, of course, private network tunnels may be and can be created. However, the term is not limited by the patent to only private network tunnels.

(Dkt. #29 at p. 6).

### b. Analysis

Plaintiff cites the following disclosure in the specification:

The ghost-mobile node 220 can replicate the registration request, handle the *creation of tunnels*, and replicate authentication and authorization information from the mobile node 250, thus acting on behalf of the mobile node 250 before the mobile node is in range of a next foreign agent 215, 230.

* * *

The home agent 205 can initiate a tunnel to the foreign agent 210 and transmit a registration reply. The foreign agent 210 can *create a tunnel* to the foreign agent 215, defining a leaf foreign agent, and forward the registration reply to the foreign agent. … Accordingly, the foreign agent 215 can *open a tunnel* to the next foreign agent 230 and send a registration reply.

'417 Patent at 10:1–6 & 10:41–57 (emphasis added).

These disclosures cited by Plaintiff refer to "tunnels" and "initiat[ing] a tunnel," but these disclosures do not purport to define "tunnel" and do not describe any of the attributes of a "tunnel."  Defendants, by contrast, cite an explicit discussion of what "tunneling refers to" "[a]s used herein":

> *As used herein, tunneling refers to* the transmission of data intended for use only within a *private*, such as a corporate, *network through a public network wherein the transmission is performed in such a way that the routing nodes in the public network are unaware that the transmission is part of a private network*. Tunneling is generally performed by encapsulating the private network data and protocol information within the public network transmission units so that the private network protocol information appears to the public network as data. Tunneling allows the use of the Internet, which is a public network, to convey data on behalf of a private network. Common examples of tunneling techniques can include, but are not limited to, Point-to-Point Tunneling Protocol (PPTP) and generic routing encapsulation (GRE). Still, any of a variety of different tunneling techniques can be used.

'417 Patent at 5:55–6:2 (emphasis added).

This disclosure of what "tunneling refers to" "[a]s used herein" is a lexicography.  *See, e.g., ParkerVision, Inc. v. Vidal*, 88 F.4th 969, 976 (Fed. Cir. 2023) ("The patentee's use of the phrases 'as used herein' and 'refer to' conveys an intent . . . to be definitional.").  Although this disclosure refers to "tunneling" rather than "tunnel," Plaintiff does not persuasively demonstrate any relevant distinction therebetween, particularly in the absence of any similar lexicography as to "tunnel."

The opinions of the Plaintiff's named-inventor-experts do not compel otherwise.  (*See* Dkt. #26, Ex. 5, Aug. 18, 2025 Hernandez Decl. at ¶¶ 35–39; *see also id.*, Ex. 4, Aug. 18, 2025

Helal Decl. at ¶ 13).  For example, Dr. Helal opines that tunneling can be used "when the last-hop routing of the original packet sent by one endpoint (sender endpoint) to its intended final destination (mobile node) can be determined only by the other endpoint (receiving endpoint)." (*Id.*).  Also, Dr. Hernandez opines: "The tunnels described by the '508 and '417 patents' specifications are related to packet encapsulation and are not dependent on private and public networks as defendant erroneously limits the use of private IP addresses (192.168.* and 10.*) and public routable addresses, which is incorrect as public IP Addresses can be encapsulated into private IP Addresses, as well as public on public, and private on private."  (*Id.*, Ex. 5, Aug. 18, 2025 Hernandez Decl. at ¶ 39).

These opinions of Plaintiff's named-inventor-experts are unpersuasive because *Phillips* states that "the inventor's lexicography governs," which refers to the named inventor's lexicography as set forth in the intrinsic record rather than in litigation-related statements. *Phillips*, 415 F.3d at 1316.

The Court therefore hereby construes **"tunnel"** to mean **"transmission of data through a public network, wherein the data is for use only as part of a private network, and wherein the transmission is performed in such a way that the routing nodes in the public network are unaware that the transmission is part of a private network."**

### 13.  "signaling further comprises at least one of a tunnel and a communication network"

| **"signaling further comprises at least one of a tunnel and a communication network"** ('417 Patent, Claim 3) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 4; Dkt. #30 at p. 23 of 54).

### a. The Parties' Positions

Plaintiff argues that a person of ordinary skill would recognize that this term contains a minor typographical error and would read the term in context as meaning "wherein signaling further comprises at least one tunnel and at least one communication network."  (Dkt. #26 at p. 11).

Defendants respond that the language is nonsensical on its face because "signaling" cannot "comprise" a "communication network," arguing that nothing in the patent supplies a clear correction or clarification.  (Dkt. #27 at pp. 20–21.)

Plaintiff replies by emphasizing that the Patent Trial and Appeal Board ("PTAB") expressly found no ambiguity or lack of antecedent basis.  (Dkt. #29 at p. 6–7).

### b. Analysis

As a threshold matter, the PTAB findings cited by Plaintiff do not affect the Court's analysis.  Indeed, although the PTAB statements cited by Plaintiff were directed to the same claim, those statements were directed to a different aspect of the claim.  (Dkt. #26, Ex. 2A, Dec. 2, 2019 Final Written Decision at p. 38).

Turning to the claim language, Claim 3 of the '417 Patent depends from Claim 1, and Claims 1 and 3 recite (emphasis added):

1. A system for communicating between a mobile node and a communication network; the network having at least one communications network node that is interconnected using a proxy mobile internet protocol (IP), comprising:
    at least one mobile node:
    at least one home agent;
    at least one foreign agent;
    a ghost-foreign agent that advertises messages to one of the mobile nodes indicating presence of the ghost-foreign agent on behalf of one of the foreign agents when the mobile node is located in a geographical area where the foreign agent is not physically present; and
    a ghost-mobile node that creates replica IP messages on behalf of a mobile node, the ghost-mobile node handling *signaling required to allocate resources*

*and initiate mobility on behalf of the mobile node*, the ghost-mobile node triggering signals based on a predicted physical location of such mobile node or distance with relation to the at least one foreign agent.

* * *

3. The system of claim 1, *wherein signaling further comprises at least one of a tunnel and a communication network* to allocate resources between the mobile node and foreign agent, the signaling being triggered at a threshold distance to one of the foreign agents reported by one of the mobile nodes, the threshold distance reported to one of the foreign agents at least one of a projected trajectory and a speed.

Defendants' expert opines that this term is unclear as to how a "communication network" could be "signaling" or how a communication network could be "triggered" as recited by Claim 3. (Dkt. #27, Ex. K, Sept. 8, 2025 Proctor Decl. at ¶¶ 73–74). The claim, however, recites that what is triggered is "signaling," not a "communication network." Also, although "[i]n the patent claim context the term 'comprising' is well understood to mean 'including but not limited to,'" *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007), the recital that "signaling further comprises . . . a communication network" can be readily understood as meaning that the signaling *uses* a communication network. Defendants therefore do not meet their burden to show indefiniteness by clear and convincing evidence. *Sonix*, 844 F.3d at 1377.

Finally, Plaintiff persuasively asserts that the recital of "at least one . . . and . . ." requires at least one of each category, and in the context of this particular claim this appears to be consistent with Federal Circuit authority. *See SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004) ("The phrase 'at least one of' precedes a series of categories of criteria, and the patentee used the term 'and' to separate the categories of criteria," so "the phrase 'at least one of' modifies each member of the list, i.e., each category in the list.").

The Court accordingly hereby construes **"signaling further comprises at least one of a tunnel and a communication network"** to mean **"signaling further comprises using at least one tunnel and at least one communication network."**

### 14. "the signaling being triggered at a threshold distance to one of the foreign agents reported by one of the mobile nodes, the threshold distance reported to one of the foreign agents at least one of a projected trajectory and a speed"

| "the signaling being triggered at a threshold distance to one of the foreign agents reported by one of the mobile nodes, the threshold distance reported to one of the foreign agents at least one of a projected trajectory and a speed" ('417 Patent, Claim 3) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 5).

As noted in Defendants' responsive claim construction brief, Defendants now "agree that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 8 n.5; *see* Dkt. #30 at pp. 23–24 of 54).

The Court therefore hereby construes "the signaling being triggered at a threshold distance to one of the foreign agents reported by one of the mobile nodes, the threshold distance reported to one of the foreign agents at least one of a projected trajectory and a speed" to have its **plain meaning**.

### 15. "mobile IP advertisement messages"

| "mobile IP advertisement messages" ('417 Patent, Claim 6) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 5; Dkt. #30 at p. 24 of 54).

### a. The Parties' Positions

Plaintiff argues that "the specification describes that an 'advertisement' is merely a 'message' that typically include IP addresses for foreign agents," and "[t]his is also the plain and ordinary meaning of this phrase."  (Dkt. #26 at p. 20) (citation omitted).

Defendants respond that "mobile IP advertisement messages" is indefinite because the term has no known meaning in the art and because the patent does not provide any guidance. (Dkt. #27 at p. 21).  Defendants also argue that "the plain and ordinary meaning Mobility ascribes to 'mobile IP advertisement messages' is simply 'messages,'" and "Mobility cannot preserve the validity of this vague and meaningless phrase by rewriting the claim to eliminate the problematic words."  (*Id.*) (citation omitted).

Plaintiff replies by noting that the PTAB did not find this term indefinite and that "Mobility does not propose that this term merely means 'messages', as Defendant suggests, but rather Mobility explained in its Opening Brief at 13–14 that the plain and ordinary meaning of this term is 'messages that typically include IP addresses for foreign agents.'"  (Dkt. #29 at p. 7).

### b. Analysis

As a threshold matter, the PTAB findings cited by Plaintiff do not affect the Court's analysis.  Although the PTAB statements cited by Plaintiff were directed to the same claim, those statements did not address definiteness.  (Dkt. #26, Ex. 2A, Dec. 2, 2019 Final Written Decision at pp. 33–34).

Turning to the claim language, Claim 6 of the '417 Patent depends from Claim 1, and Claims 1 and 6 recite (emphasis added):

1. A system for communicating between a mobile node and a communication network; the network having at least one communications network node that is interconnected using a proxy mobile internet protocol (IP), comprising:

    at least one mobile node;

    at least one home agent;

    at least one foreign agent;

    a ghost-foreign agent that advertises messages to one of the mobile nodes indicating presence of the ghost-foreign agent on behalf of one of the foreign agents when the mobile node is located in a geographical area where the foreign agent is not physically present; and

    a ghost-mobile node that creates replica IP messages on behalf of a mobile node, the ghost-mobile node handling signaling required to allocate resources and initiate mobility on behalf of the mobile node, the ghost-mobile node triggering signals based on a predicted physical location of such mobile node or distance with relation to the at least one foreign agent.

\* \* \*

6. The system of claim 1, wherein the at least one ghost-foreign agent populates *mobile IP Advertisement messages* with at least one care-of-address of neighboring foreign agents in order to extend the range of neighboring foreign agents.

Turning to the specification, the specification discloses "Mobile Internet Protocol (Mobile IP)." '417 Patent at 1:36–56. The phrase "mobile IP" in Claim 6 can thus be readily understood as referring to the "Mobile Internet Protocol (Mobile IP)." Also, the specification uses the word "advertisement" to refer to messages that include information about an agent. *Id.* at 3:9, 10:19, 10:23, 10:31, 10:50 & 10:60; *see generally id.* at 10:14–40. Claim 6 of the '417 Patent, reproduced above, already includes context regard the content of such messages, so no construction of "mobile IP advertisement messages" is necessary. The indefiniteness opinion of Defendants' expert is therefore unpersuasive. (*See* Dkt. #27, Ex. K, Sept. 8, 2025 Proctor Decl. at ¶¶ 79–80.) Defendants do not meet their burden to show indefiniteness by clear and convincing evidence. *Sonix*, 844 F.3d at 1377. Defendants present no alternative proposed construction, and no further construction is necessary.

The Court therefore hereby construes **"mobile IP Advertisement messages"** to have its **plain meaning**.

### 16. "the at least one ghost-foreign agent populates mobile IP Advertisement messages with at least one care-of-address of neighboring foreign agents"

| "the at least one ghost-foreign agent populates mobile IP Advertisement messages with at least one care-of-address of neighboring foreign agents" ('417 Patent, Claim 6) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 5).

As noted in Defendants' responsive claim construction brief, Defendants now "agree that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 8 n.5; *see* Dkt. #30 at p. 24 of 54).

The Court therefore hereby construes "the at least one ghost-foreign agent populates mobile IP Advertisement messages with at least one care-of-address of neighboring foreign agents" to have its **plain meaning**.

*Disputed Claim Terms in United States Patent No. 7,231,330*

In the discussion herein, the disputed terms in United States Patent No. 7,231,330 are numbered as they appear in the parties' July 25, 2025 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. #24, App'x B).

### 17. "wireless"

| "wireless" ('330 Patent, Claims 1–6, 9, 11–17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "without wires or cables, and only through air or vacuum" |

(Dkt. #24, App'x B at p. 6; Dkt. #30 at p. 25 of 54).

### a. The Parties' Positions

Plaintiff argues that the *Motorola* construction, proposed here by Defendants, "is critically flawed because 'wireless' is an adjective that can have different meanings based on what term it is modifying," and, for example, "the 'wireless nodes' can include a routing device connected by wires . . . ." (Dkt. #26 at p. 16). Plaintiff also argues that "a 'wireless' signal is merely one with a particular radio frequency and can be emulated in a wired system as taught and claimed by the '330 patent." (*Id.* at p. 17) (citation omitted).

Defendants respond that *Motorola* analyzed this term in detail, and, moreover, "Mobility agreed to the construction in the *Verizon* Case and this Court adopted the construction on the basis of Mobility's representation, thus Mobility is judicially estopped from advocating for a different construction." (Dkt. #27 at p. 22). Defendants also argue that whereas Plaintiff is attempting to "sweep[] *wired* connections into the literal meaning of '*wireless*,'" "[i]t is inconceivable that the plain and ordinary meaning of a word can encompass its antonym." (*Id.* at p. 23).

Plaintiff replies that "[t]here is no argument that Mobility adopted a specific meaning of the term in its patents, and thus Mobility's suggestion that the term be given its plain and ordinary meaning is far better than Defendant's confusing and misleading construction that could

lead a jury to mistakenly believe something 'wireless' must be completely without wires or cables." (Dkt. #29 at p. 7–8).

### b. Analysis

Claim 1 of the '330 Patent, for example, recites (emphasis added):

1. A system for emulating mobile network communications comprising:
     a plurality of fixedly-located *wireless* network nodes configured to variably adjust *wireless* communication characteristics;
     at least one mobile node configured to wirelessly communicate with selected ones of said plurality of *wireless* network nodes;
     a network emulator communicatively linked to each of said plurality of *wireless* network nodes, said network emulator configured to emulate attributes of a packet-based wired communications network for simulating network conditions experienced by said at least one mobile node in communicating with other nodes through the wired communications network, the emulated attributes comprising at least one of tunable packet-delay distribution, network congestion, bandwidth limitation, and packet re-ordering and duplication; and
     a controller communicatively linked to each of said plurality of *wireless* network nodes, said controller configured to control the *wireless* communication characteristics of each of said plurality of *wireless* network nodes to simulate, without changing operating parameters of said at least one mobile node, different *wireless* communication conditions experienced by said at least one mobile node in actual operation.

The Southern District of Florida analyzed the term "wireless" in *Motorola* (*see Motorola* at 3–4), and in *Verizon* the parties agreed upon the *Motorola* construction, which this Court adopted. *Verizon* at 7. Plaintiff's proposal to remove the requirement that "wireless" means "without wires or cables, and only through air or vacuum," is inconsistent with Plaintiff's affirmatively agreed-upon construction in *Verizon*, which the Court accepted. *Id.* Plaintiff is therefore judicially estopped from proposing a different construction. *See Love*, 677 F.3d at 261.

Moreover, even if Plaintiff were not judicially estopped, Plaintiff's proposal that "a 'wireless' signal is merely one with a particular radio frequency and can be emulated in a wired system" (Dkt. #26 at p. 17) is not supported by the disclosure cited by Plaintiff (*see* '330 Patent at 1:59–60, 2:25–28, 2:40–43, 3:22–26 & Fig. 1) and would read "wireless" out of the claim by

encompassing wired-only embodiments. That is, although the parties agree that a "wireless" network can involve wires, a "wireless" *communication* between a network and a "wireless" device does not use wires.

The Court therefore hereby construes **"wireless"** to mean **"without wires or cables, and only through air or vacuum."**

### 18. "wireless network node" and "wireless network nodes"

| **"wireless network node"** **"wireless network nodes"** ('330 Patent, Claims 1, 2, 5, 9, 11, 14–16) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "an element of a wireless network that sends and receives signals" | "an element of a network that sends and receives signals wirelessly" |

(Dkt. #24, App'x B at p. 6; Dkt. #30 at p. 29 of 54).

#### a. The Parties' Positions

Plaintiff argues that, although Defendants propose the *Motorola* construction, Plaintiff "believes that the word wireless modifies the word 'element' and not the words 'sends and receives.'" (Dkt. #26 at p. 18). Plaintiff argues that "[t]he intrinsic evidence does not support Defendant's proposal that wireless nodes must send and receive signals wirelessly and only wirelessly." (*Id.*).

Defendants respond that *Motorola* analyzed this term in detail, and, "[m]oreover, Mobility agreed to the construction in the *Verizon* Case and this Court adopted the construction on the basis of Mobility's representation, thus Mobility is judicially estopped from advocating for a different construction." (Dkt. #27 at p. 23). Defendants also argue that "[t]he only logical reading of 'wireless network node' in the context of the specification is that 'wireless' modifies

'node.'" (*Id.* at p. 24). Further, Defendants argue that "Mobility's proposed construction would result in a 'wireless node' encompassing *any* 'element' in a wireless network that sends and receives signals," and "[u]nder this interpretation, Mobility would be able to point to virtually everything in a 'wireless network' as being a 'wireless node.'" (*Id.*).

Plaintiff replies, in full: "Ericsson admits that when the patent wishes to identify a 'wireless node' it did so. Response Brief at 24. Yet, in the claims, the term is not 'wireless node', but rather 'wireless network node', meaning in the claims the term 'wireless' modifies 'network' not 'node.'" (Dkt. #29 at p. 8).

### b. Analysis

Defendants propose the construction that the Southern District of Florida reached for this disputed term in *Motorola* (*see Motorola* at 5–6), and *Verizon* adopted that construction as agreed-upon. *Verizon* at 7. Plaintiff's proposal to remove the requirement of sending and receiving signals "wirelessly" is inconsistent with Plaintiff's affirmatively agreed-upon construction in *Verizon*, which the Court accepted. *Id.* Plaintiff is therefore judicially estopped from now proposing a different construction. *See Love*, 677 F.3d at 261.

Moreover, for substantially the same reasons discussed as to the term "wireless," above, Plaintiff's proposal of removing the requirement of sending and receiving signals "wirelessly" lacks support in the intrinsic evidence and appears to be inconsistent with the specification. *See* '330 Patent at 3:10–18 ("while the mobile node wirelessly communicates with at least one of the wireless nodes") & 4:33–37 ("It will be readily appreciated by those of ordinary skill in the art that the mobile nodes 125 can be implemented as any suitable computing device having a wireless transceiver capable of communicating wirelessly with the wireless nodes 105.").

The Court therefore hereby construes **"wireless network nodes"** and **"wireless nodes"** to mean **"an element of a network that sends and receives signals wirelessly."**

### 19.  "mobile node configured to wirelessly communicate" and "mobile node wirelessly communicates"

| **"mobile node configured to wirelessly communicate"**<br>**"mobile node wirelessly communicates"**<br>('330 Patent, Claims 1, 11) ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a device that can send and receive wireless signals" | "a device that sends and receives signals wirelessly" |

(Dkt. #24, App'x B at p. 6; Dkt. #30 at p. 33 of 54).

### a.  The Parties' Positions

Plaintiff argues that, although Defendants propose the *Motorola* construction, the claims require capability to send/receive wireless signals, not that every transmission in every context is wireless.  (Dkt. #26 at p. 19).

Defendants respond that *Motorola* analyzed this term in detail, and, "[m]oreover, Mobility agreed to the construction in the *Verizon* Case and this Court adopted the construction on the basis of Mobility's representation, thus Mobility is judicially estopped from advocating for a different construction."  (Dkt. #27 at p. 25).  Defendants also argue that "[t]here is no support for Mobility's proposed construction, which again attempts to open the door to wired communications being wireless communications."  (*Id.*).

Plaintiff replies: ". . . Mobility merely proposes a slight change to the construction of this term that is not plainly inconsistent to any position it previously took.  While this term was construed in *Motorola* over a decade ago, Mobility did not advocate there for the construction adopted by that court, and the *Motorola* court expressly stated it rejected Plaintiffs' construction.

*Motorola* at 5-6." (Dkt. #29 at p. 8). Plaintiff also argues: "[I]f a controller is to work efficiently in emulating a wireless network, a wired connection to send and receive what appear to be wireless signals makes complete and total sense. That is indeed the invention embodied in the patent, the ability to emulate a wireless network without having to build a wireless network. This is why the correct construction of this term (and the other terms discussed herein) is not that the mobile node being tested in the emulator sends and receives signals wirelessly, but rather that it sends and receives wireless signals – whether those signals are carried over wires, wireless links, or a combination of both, depending on how the emulator is configured." (*Id.* at pp. 8–9).

### b. Analysis

Defendants propose the construction that the Southern District of Florida reached for this disputed term in *Motorola*. *See Motorola* at 5.

Plaintiff's present proposal of "a device that *can* send and receive wireless signals" is inconsistent with the *Motorola* construction (*see Motorola* at 3–5), which Plaintiff agreed to in *Verizon* (*Verizon* at 7). Plaintiff's proposal is thus contrary to what it deliberately accepted (and thus contrary to what the Court relied upon) in *Verizon*. Indeed, Plaintiff's proposal of a mere capability would be contrary to Plaintiff's prior proposal of a construction requiring actual configuration. Plaintiff's proposal that "the construction should be slightly modified to clarify that the term 'wireless' modifies the word [']signals['] and not the words 'sends and receives'" (Dkt. #26, at p. 18) is not a "slight[] modifi[cation]" but rather is contrary to *Motorola* and contrary to what Plaintiff proposed in *Verizon*. Plaintiff is judicially estopped from seeking the construction that it is proposing in the present case. *Love*, 677 F.3d at 261.

Moreover, even if Plaintiff's proposal were considered on the merits, Plaintiff's proposal of a mere capability ("*can* send and receive") is inconsistent with these disputed terms requiring "configur[ation]" and "communicat[ion]."

The Court accordingly hereby construes **"mobile node configured to wirelessly communicate"** and **"mobile node wirelessly communicates"** to mean **"a device that sends and receives signals wirelessly."**

### 20. "emulator"

| **"emulator"** (ʼ330 Patent, Claims 1, 2, 5, 11, 16) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a system or device (either hardware, software, or both) that imitates, models or simulates the conditions, acts or functions of a real-world event, system device, or condition" |

(Dkt. #24, App'x B at p. 6).

As noted in Defendants' responsive claim construction brief, Defendants now "agree[] that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 22 n.6; *see* Dkt. #30 at p. 35 of 54).

The Court therefore hereby construes "emulator" to have its **plain meaning**.

### 21. "emulating," "emulate," "emulated," and "emulates"

| "emulating"<br>"emulate"<br>"emulated"<br>"emulates"<br>('330 Patent, Claims 1, 2, 8, 11, 17, 19) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "Plain and ordinary meaning" | "the act of imitating, modeling or simulating the conditions, acts or functions of a real-world event, system, device, or condition" |

(Dkt. #24, App'x B at p. 7).

As noted in Defendants' responsive claim construction brief, Defendants now "agree[] that these terms should be given their plain and ordinary meaning." (Dkt. #27 at p. 22 n.6; *see* Dkt. #30 at p. 38 of 54).

The Court therefore hereby construes "emulating," "emulate," "emulated," and "emulates" to have their **plain meaning**.

### 22. "a packet-based wired communications network"

| "a packet-based wired communications network"<br>('330 Patent, Claims 1, 11) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a communications network in which IP packets of data are transmitted through wires or cables" | "a communications network in which packets of data are transmitted through wires or cables" |

(Dkt. #24, App'x B at p. 7; Dkt. #30 at p. 41 of 54).

#### a. The Parties' Positions

Plaintiff argues that, although Defendants propose the *Motorola* construction, "Mobility believes that one slight modification should be made to clarify the scope of the claim, namely

that the 'packets of data' are 'IP packets of data.'" (Dkt. #26 at p. 21). Plaintiff urges that "the packets of data in the '330 Patent are all IP packets of data," and "[t]he construction of this term should reflect that fact in order to avoid potential debates about this term in the future." (*Id.* at p. 22).

Defendants respond that *Motorola* analyzed this term in detail, and, "[m]oreover, Mobility agreed to the construction in the *Verizon* Case and this Court adopted the construction on the basis of Mobility's representation, thus Mobility is judicially estopped from advocating for a different construction." (Dkt. #27 at p. 26). Alternatively, Defendants argue that "Mobility does not identify a single piece of intrinsic evidence that supports its construction." (*Id.*).

Plaintiff replies, in full: "Mobility merely proposes a slight clarification to this term's construction not plainly inconsistent to its previous positions. As explained by Dr. Helal, and not disputed by Ericsson, in networks to which the '330 Patent is directed, all packet data is IP packet data. Decl. Helal at 8." (Dkt. #29 at p. 9).

### b. Analysis

Plaintiff's present proposal of limiting this term so as to require "IP" packets is narrower than the *Motorola* construction (*see Motorola* at 6–7) that Plaintiff agreed to in *Verizon* (*Verizon* at 7). Plaintiff's proposal is thus contrary to what it deliberately accepted, and thus to what the Court relied upon, in *Verizon*. This is not a "slight modification," as Plaintiff calls it (Dkt. #26, at p. 21), but rather is a proposal to introduce a substantial additional limitation that the packets must be "IP" packets. Plaintiff is therefore judicially estopped from seeking such as construction in the present case. *Love*, 677 F.3d at 261.

Moreover, even if Plaintiff's proposal were considered on the merits, the disclosure relied upon by Plaintiff is unavailing because it refers to examples of "Mobile IP, Mobile IP v. 6,

Cellular-IP, and the like." '330 Patent at 10:3–7. One of Plaintiff's named-inventor-experts, Dr. Helal, opines: "While at the time of invention, there existed other packet-like networking architectures (e.g., Asynchronous Transfer Mode (ATM), X.25, FrameRelay, DecNet, and Token Ring), such network architectures were an extreme and diminishing minority. Further, none of such network architectures supported mobility. Only IP networks supported mobility by creating extensions such as Mobile IP, Mobile IP V6, and Cellular-IP." (Dkt. #26, Ex. 4, Aug. 18, 2025 Helal Decl. ¶ 15). Even the disclosure cited by Plaintiff, however, refers broadly to "and the like." '330 Patent at 10:3–7. Plaintiff does not overcome the general principle that "particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant*, 848 F.2d at 1571.

The Court therefore hereby construes **"a packet-based wired communications network"** to mean **"a communications network in which packets of data are transmitted through wires or cables."**

### 23. "wireless communication conditions"

| "wireless communication conditions" ('330 Patent, Claims 1, 11) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 7; Dkt. #30 at p. 43 of 54).

### a. The Parties' Positions

Plaintiff argues that the meaning of this term is reasonably clear because the specification discloses that "by varying the rate and amount of attenuation of one or more of the attenuators,

different characteristics of motion such as the trajectory, speed, and/or acceleration of the mobile node can be emulated." (Dkt. #26 at p. 22) (citation omitted).

Defendants respond that "[t]he phrase 'wireless communication conditions' does not appear in the specification of the '330 Patent, and there is nothing in the intrinsic evidence that sheds any light on what the 'wireless communication conditions' are and how, if at all, they differ from the claimed 'wireless communication characteristics.'" (Dkt. #27 at pp. 26–27).

Plaintiff replies that the specification explains that "wireless communication conditions" relate to the "moving" or "motion" of a mobile node toward or away from wireless nodes. (Dkt. #29 at p. 9) (citing '330 Patent at 6:50–68).

### b. Analysis

Claim 1 of the '330 Patent, for example, recites (emphasis added):

1. A system for emulating mobile network communications comprising:
    a plurality of fixedly-located wireless network nodes configured to variably adjust wireless communication characteristics;
    at least one mobile node configured to wirelessly communicate with selected ones of said plurality of wireless network nodes;
    a network emulator communicatively linked to each of said plurality of wireless network nodes, said network emulator configured to emulate attributes of a packet-based wired communications network for simulating network conditions experienced by said at least one mobile node in communicating with other nodes through the wired communications network, the emulated attributes comprising at least one of tunable packet-delay distribution, network congestion, bandwidth limitation, and packet re-ordering and duplication; and
    a controller communicatively linked to each of said plurality of wireless network nodes, said controller configured to control the wireless communication characteristics of each of said plurality of wireless network nodes to simulate, without changing operating parameters of said at least one mobile node, different *wireless communication conditions* experienced by said at least one mobile node in actual operation.

The specification discloses:

The controller 120 can concurrently set the attenuator 145 of wireless node 105, labeled B (hereafter 105B), to maximize attenuation. That is, wireless node 105B can be set for maximum attenuation while wireless node 105A is communicating

with the mobile node 125. Subsequently, while the attenuation for wireless node 105A is increasing, the controller 120 can cause the attenuation of wireless node 105B to decrease so as to simulate mobile node 125 moving away from wireless node 105A and moving toward wireless node 105B. The emulator 110 can simulate various conditions of an attached wired network. By varying the amount of attenuation provided by each attenuator 145 and the rate at which the attenuation either increases and/or decrease in each respective network node 105, the controller 120 emulates motion of the mobile node 125 for any of a variety of different *trajectories, speeds, and/or accelerations*. It should be appreciated that more than one mobile node 125 can be used or be active at one time.

'330 Patent at 6:50–68 (emphasis added).

As noted, by varying the rate and amount of attenuation of one or more of the attenuators, different characteristics of motion such as the *trajectory, speed, and/or acceleration* of the mobile node can be emulated.

*Id.* at 7:55–59 (emphasis added).

In the context of these disclosures, "conditions" can be readily understood to refer to whatever *affects* the wireless communication characteristics of a node when the node is "in actual operation" as recited by the claims. The indefiniteness opinions of Defendants' expert in this regard are unpersuasive. (*See* Dkt. #27, Ex. K, Sept. 8, 2025 Proctor Decl. ¶ 88 ("there is nothing in the intrinsic evidence that provides any indication to a person of ordinary skill in the art regarding the scope of the term 'wireless communication conditions' compared to the scope of the term 'wireless communication characteristics'); *see also id.* at ¶¶ 87–90).

Defendant's argument at the October 8, 2025 hearing that "trajectories, speeds, and/or accelerations" ('330 Patent at 6:50–68) are movements, not conditions, is unpersuasive. In particular, the difference between "wireless communication characteristics" and "wireless communication conditions" is readily understandable based on the context of the latter being recited as what would be "experienced by said at least one mobile node in actual operation."

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed construction, and no further construction is necessary because of the context provided by surrounding claim language.

The Court accordingly hereby construes "wireless communication conditions" to have its **plain meaning**.

### 24. "controller"

| "controller" ('330 Patent, Claims 1, 6, 8, 11) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | 35 U.S.C. § 112(f) Indefinite |

(Dkt. #24, App'x B at p. 7).

As noted in Defendants' responsive claim construction brief, Defendants now "agree[] that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 22 n.6; *see* Dkt. #30 at p. 45 of 54).

The Court therefore hereby construes "controller" to have its **plain meaning**.

### 25. "home agent"

| "home agent" ('330 Patent, Claims 2, 11, 16) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a device (or program) that maintains information about a mobile device's current location" |

(Dkt. #24, App'x B at p. 7).

As noted in Defendants' responsive claim construction brief, Defendants now "agree[] that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 22 n.6; *see* Dkt. #30 at p. 47 of 54).

The Court therefore hereby construes "home agent" to have its **plain meaning**.

### 26. "signal reception sensitivity"

| "signal reception sensitivity" ('330 Patent, Claims 3, 6, 12) ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 8).

As noted in Defendants' responsive claim construction brief, Defendants now "agree[] that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 22 n.6; Dkt. #30 at p. 49 of 54).

The Court therefore hereby construes "signal reception sensitivity" to have its **plain meaning**.

### 27. "wireless access point"

| "wireless access point" ('330 Patent, Claims 5, 6, 14) ||
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "device that communicates a wireless protocol signal wirelessly" |

(Dkt. #24, App'x B at p. 8; Dkt. #30 at p. 49 of 54).

### a. The Parties' Positions

Plaintiff argues that, although Defendants propose the *Motorola* construction, "the '330 Patent shows, such as in Fig. 1, that 'wireless access points' can send and receive signals via wires, and do not always exclusively send and receive signals wirelessly." (Dkt. #26 at p. 22).

Defendants respond that *Motorola* analyzed this term and that the same construction should be adopted here. (Dkt. #27 at p. 27). Defendants also submit that "[Defendant] Ericsson is not advocating that a 'wireless access point' cannot have *any* wires, but rather that it is something that is configured to communicate wirelessly." (*Id.* at p. 28).

Plaintiff replies that "Mobility does not suggest that access points *only* communicate without wires, but rather that access points can communicate with or without wires and can indeed be software or testing equipment." (Dkt. #29 at p. 10).

### b. Analysis

Plaintiff argues that the *Motorola* construction should not be adopted because communications by a wireless access point are not exclusively wireless, but the *Motorola* construction requires wireless communication without precluding *also* sending and receiving signals on wires. *Motorola* at 5; *see id.* at 4 (as to "wireless": "Plaintiffs have confused a characteristic of wireless communication with the definition of wireless communication."). For example, a "wireless" access point can allow a device to wirelessly connect to a wired network (to which the wireless access point is connected with wires).

Also, Plaintiff cites disclosure in the specification demonstrating that an antenna of a wireless access point can be connected to other components by wires (*see* '330 Patent at 5:17–25), but, again, this is not inconsistent with requiring a wireless access point to be able to communicate using a wireless protocol signal as found in *Motorola*.

Finally, Plaintiff argued at the October 8, 2025 hearing that this term should not be limited to a "device" because this term could be implemented as software, but, as the parties discussed during the hearing, any such software would necessarily require some amount of hardware upon which to operate.  Plaintiff thus did not persuasively justify departing from the *Motorola* construction in this regard.

The Court therefore hereby construes **"wireless access point"** to mean **"device that communicates a wireless protocol signal wirelessly."**

### 28. "attenuator" and "attenuation"

<table>
<tr><td colspan="2" align="center">**"attenuator"**<br>**"attenuation"**<br>('330 Patent, Claims 5–8, 14, 17–19)</td></tr>
<tr><td>**Plaintiff's Proposed Construction**</td><td>**Defendants' Proposed Construction**</td></tr>
<tr><td>Plain and ordinary meaning</td><td>"a device that can increase or decrease the level of a signal"</td></tr>
</table>

(Dkt. #24, App'x B at p. 8; Dkt. #30 at p. 50 of 54).

### a. The Parties' Positions

Plaintiff argues that, although Defendants propose the *Motorola* construction, "'attenuation' cannot increase the level of a signal." (Dkt. #26 at p. 25.)

Defendants respond that *Motorola* analyzed these terms and that the same construction should be adopted here.  (Dkt. #27 at p. 28).  Defendants also submit that "[Defendant] Ericsson's proposed construction is consistent with the specification and provides specificity that will assist the fact finder in evaluating the case." (*Id.*).  In particular, Defendants urge that "the specification makes clear that the claimed attenuator can increase and decrease the level of a

signal by changing the attenuation level, consistent with Ericsson's proposed construction." (*Id.* at p. 29).

> Plaintiff replies, in full:

> Much like a sink faucet cannot increase the volume of water flowing through it, as that is dictated by the source of the water to the faucet, an attenuator cannot increase the level of the signal that it receives. It can decrease that signal, much like a water faucet can decrease the amount of water flowing through it from what is flowing to it, but it cannot increase the level of the signal. This is the extremely common and uncontroversial understanding of the term "attenuator" that is plain and ordinary. Ericsson has not shown any reason to adopt its specific definition.

(Dkt. #29 at p. 10).

### b. Analysis

Defendants propose the *Motorola* construction (*Motorola* construed both "attenuator" and "attenuation" to mean "[a] device that can increase or decrease the level of a signal"). *Motorola* at 8. The parties in that case did not dispute the "increase or decrease" aspect of the construction. *See id.* There, Plaintiff proposed "[a] device that can change one or more of the characteristics of a wireless signal," and *Motorola* found that "while attenuation may alter signal *characteristics*, that is not synonymous with the meaning of the term, which refers to an alteration of the signal *level*." *Id.* (emphasis added).

In the present case, Defendants persuasively show that changing the amount of attenuation can increase or decrease the level of a signal. In particular, the specification discloses as follows:

> The controller can be configured to dynamically adjust the wireless communication characteristics of one or more of the wireless access points by *varying an amount of attenuation provided by the attenuators* to simulate motion of one or more of the mobile nodes. For example, attenuation provided by at least one of the attenuators can be *increased* while simultaneously *decreasing* attenuation provided by another one of the attenuators. The controller can dynamically adjust the amount of attenuation provided by at least two of the

attenuators to emulate at least one mobile network characteristic such as speed, acceleration, and/or trajectory of the mobile node.

\* \* \*

For example, by *increasing the amount of attenuation* provided by an attenuator 145, the power delivered from a wireless access point 130 to an attached antenna 140 for transmission as well as the power of a signal received by an antenna 140 that is delivered to the wireless access point 130 can be reduced. *Decreasing the amount of attenuation* allows the wireless access point 130 to deliver increased power to an attached antenna 140 for transmission as well as receive higher power signals from the attached antenna 140.

'330 Patent at 2:59–3:3 & 5:17–25 (emphasis added).

Thus, although "attenuation" refers to a decrease in the level of a signal, an "attenuator" can increase *or decrease* the degree of attenuation so as to decrease *or increase* the resulting level of the signal, respectively. The *Motorola* construction can be modified to clarify this.

Finally, Plaintiff argued at the October 8, 2025 hearing that this term should not be limited to a "device" because this term could be implemented as software, but, as the parties discussed during the hearing, any such software would necessarily require some amount of hardware upon which to operate. Also, as noted above, Plaintiff's proposal in *Motorola* included the word "device." *Motorola* at 8.

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"attenuation"** | **"decrease in the power level of a signal"** |
| **"attenuator"** | **"a device that can increase or decrease an amount of attenuation"** |

### 29. "antenna"

| "antenna" ('330 Patent, Claims 5, 10, 14) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "an electrical device that radiates electromagnetic waves wirelessly" |

(Dkt. #24, App'x B at p. 8; Dkt. #30 at p. 52 of 54).

### a. The Parties' Positions

Plaintiff argues that, although Defendants propose the *Motorola* construction, "radiating electromagnetic waves wirelessly is only one function of an antenna, as they can also sense electromagnetic waves." (Dkt. #26 at 25) (citation omitted).

Defendants respond that *Motorola* analyzed this term and that the same construction should be adopted here. (Dkt. #27 at p. 29). Nonetheless, Defendants also submit: "[Defendant] Ericsson can agree to modify its construction of 'antenna' to be 'an electrical device that radiates and senses electromagnetic waves wirelessly.' With that modification, it appears that the parties are in agreement on the construction of this term." (*Id.*).

Plaintiff replies, in full: "Mobility appreciates Ericsson's agreement with Mobility's argument but still believes no construction is necessary. Is there truly any lay juror who would not know what an 'antenna' is?" (Dkt. #29 at p. 10).

### b. Analysis

*Motorola* addressed a dispute regarding whether the construction of "antenna" should refer to "electromagnetic waves," as the defendant there proposed, or should refer to "radio frequencies," as Plaintiff proposed. *Motorola* found that "[r]adio waves are a certain frequency of electromagnetic waves[,] and antennas may be used for waves other than radio waves."

*Motorola* at 8.  The parties in that case thus apparently did not dispute whether an "antenna" can both radiate and receive, and *Motorola* favorably cited a dictionary definition that defined "antenna" as "a metallic apparatus for *sending or receiving* electromagnetic waves." *Id.* (citation omitted; emphasis added).  The specification is consistent with this understanding.  '330 Patent at 4:62–65 ("Each access point 130 can be a wireless access point having an antenna 140.  Each antenna 140 can be an omni directional antenna so as to model base station signal *transmission and reception* behavior.") (emphasis added).

Defendants here submit, as an alternative proposal, construing "antenna" to mean "an electrical device that radiates and senses electromagnetic waves wirelessly."  (Dkt. #27 at p. 29).  Consistent with the analysis set forth in *Motorola*, as well as the above-cited disclosure of "reception" in the specification, the Court here uses the word "receives" rather than "senses."

Finally, at the October 8, 2025 hearing, the Court set forth its preliminary construction as "an electrical device that radiates and/or receives electromagnetic waves wirelessly," and both sides were amenable to this construction.

The Court therefore hereby construes **"antenna"** to mean **"an electrical device that radiates and/or receives electromagnetic waves wirelessly."**

### 30.  "routing device"

| "routing device" ('330 Patent, Claims 5, 15) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a device that redirects a data signal from its input to its output" |

(Dkt. #24, App'x B at p. 8; Dkt. #30 at p. 53 of 54).

### a. The Parties' Positions

Plaintiff argues that "[t]here is no description requiring routing devices to have inputs and outputs, nor that data signals be routed from one to the other."  (Dkt. #26 at 26.)

Defendants respond that *Motorola* analyzed this term and that the same construction should be adopted here.  (Dkt. #27 at p. 29.)

Plaintiff stands on its Opening Brief.  (Dkt. #29 at p. 10.)

### b. Analysis

Claim 5 of the '330 Patent, for example, recites (emphasis added):

> 5. The system of claim 1, wherein at least one of said plurality of wireless network nodes includes:
> a wireless access point having an antenna and at least one variable attenuator; and
> a *routing device* communicatively linking said access point with said network emulator.

The specification of the '330 Patent states:

> The wireless nodes 105 further can include routers 135. Although a dedicated hardware router can be used, according to another embodiment of the present invention, one or more of the routers 135 can be implemented using a computer system having appropriate routing *software* executing therein. The routers 135 also can include mobility management software providing thresholds and events notification to avoid system problems or failure, real-time updates on network events, automatic discovery of access points, tracking of network traffic and usage for analysis of network utilization, and data reporting and data export functions.

'330 Patent at 5:26–36 (emphasis added).

*Motorola* construed "routing device" to mean "a device that redirects a data signal from its input to its output," and *Motorola* relied on a definition of "routing" in a technical dictionary provided by the defendants in that case.  (*See* No. 13-CV-61120 (S.D. Fla.), Dkt. #69 at p. 18 n.19) (citing *id.*, Ex. 18, *The Authoritative Dictionary of IEEE Standards Terms* 994 (7th ed.

2000)) ("routing (A) In data communication, a path by which a message reaches its destination. (B) A path that network traffic takes from its source to its destination.").

This technical dictionary relied upon by *Motorola* did not specifically refer to "from its input to its output," and *Motorola* set forth this phrase in its construction but not in its analysis. Based on the record as developed in the present case, the Court modifies the *Motorola* construction in this limited regard and instead relies on this same technical dictionary cited by *Motorola* to refer to a device that directs a data signal onto a path toward a destination. (*Id.*).

Finally, at the October 8, 2025 hearing, the Court set forth its preliminary construction as "a device that directs a data signal onto a path toward a destination," and both sides were amenable to this construction.

The Court hereby construes "routing device" to mean **"a device that directs a data signal onto a path toward a destination."**

### 31. "variable attenuator comprises a plurality of variable attenuators"

| "variable attenuator comprises a plurality of variable attenuators" ('330 Patent, Claim 7) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | Indefinite |

(Dkt. #24, App'x B at p. 8).

As noted in Defendants' responsive claim construction brief, Defendants now "agree[] that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 22 n.6; *see* Dkt. #30 at p. 53 of 54).

The Court therefore hereby construes "variable attenuator comprises a plurality of variable attenuators" to have its **plain meaning**.

### 32. "data logging component"

| "data logging component" ('330 Patent, Claim 9) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | 35 U.S.C. § 112(f) Indefinite |

(Dkt. #24, App'x B at p. 8).

As noted in Defendants' responsive claim construction brief, Defendants now "agree[] that th[is] term[] should be given [its] plain and ordinary meaning." (Dkt. #27 at p. 22 n.6; *see* Dkt. #30 at p. 54 of 54).

The Court therefore hereby construes "data logging component" to have its **plain meaning**.

### CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**IT IS SO ORDERED.**

**SIGNED this 20th day of October, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE